Good morning. This morning we have three cases which will be orally argued, two of additional cases which will be submitted on the record. For purposes of our record, I will list those two submitted cases. The first one is 2010-3101, Cahill v. Defense. The second is 2010-5139, Parker v. the United States. The first case to be orally argued is 2010-1069, JAPAN CASH MACHINE. I have reserved 11 minutes for your cross-appeal and four minutes for your presentation. Once you proceed, whenever you're ready. MR. RAUNCE Good morning. Michael Raunce for the JCM Appellants. I'm just going to make some brief remarks to begin my argument concerning the 406 patent that's on appeal. There is a primary claim construction issue before the court that is fairly dispositive of most of the issues concerning infringement and validity. And it's a very simple issue. What processing does the discriminator means of Claim 1 do? Is it simply determining whether the barcode is proper or whether the barcoded number is acceptable for play? Now this issue crystallized at trial because the discriminator means in JCM's October 1992 bill validator device that was the basis for the 406 patent only determined whether the barcode was proper at the validator and used a back-end system to determine acceptability, the exact same way that MEI's product worked as well. After the court heard testimony about that product from Mr. Luciano and Mr. Esoy, the court indicated that perhaps it made an error in its claim construction on that issue. However, the court did two things. Number one, it said it would be unfair to force MEI to litigate that issue at that point in the trial. And number two, when the court considered on JMAL, it nevertheless decided that the proper claim construction was that the discriminator means had to do processing concerning the acceptability for play of the barcode coupon. We claim that was error, plain and simple. There is nothing in Claim 1 that requires acceptability of barcoded coupons be determined by the discriminator means. Claim 1 refers to storing and comparing barcode patterns, but says nothing about using these patterns to determine whether the barcoded coupon is acceptable for play. Now there is a key term that we think is very important in Claim 1, and it's the word coincidence. Because that term is very clearly defined in the specification. So the comparison of correct coincidence between the stored barcode coupon. Well, I have to stop you because you've got four minutes and I don't know what you're saying. Are you talking about whether it has to be inside the housing or not, or are you trying to focus on whether or not the barcode that is stored has to be predetermined? I'm just, I'm not following you. That's fine. There is a third issue on appeal for purposes of claim construction other than the two you just mentioned, and that's the one I'm focusing on. And that is, what is the discriminator means doing? Is it determining just whether or not the barcode is genuine or valid, or is it determining that it's acceptable for play? I'm sorry, what claim term does this go to? Well, the court, what it goes to is the connection. The court found that the connection term within the claim ultimately required that the discriminator means be inside the bill validator head. So then there was an argument by MEI, both at trial and on summary judgment, that their discriminator means was outside the bill validator head because it was determining whether or not the coupon was acceptable for play. Are you trying to capture the DSP chip? I'm not sure, I'm just not following where you're trying to go. I thought maybe you were planning on arguing about the housing and whether it had to be within or whether it could be outside of. Is that not the argument that you're making now? No, it's a different argument, Your Honor. In the end event, I've allotted my time on the 406. I do want to finish my comment that when you determine the coincidence between the barcode signals in memory and the ones that were sensed, when you determine that coincidence, the specification makes clear that the only thing you're doing is determining whether the barcode is genuine. Mr. Rouse, on the question, independent of the question of infringement of the 406, why is there not substantial evidence in the form of the LaserCoin reference to support the jury's verdict of invalidity? I will focus on LaserCoin just for a moment, Your Honor. And our point there is that LaserCoin is just simply not clear and convincing evidence as a whole of invalidity. It just doesn't rise to that based upon the fact that— Well, the question I have is why? Because Mr. White's testimony was highly questionable on that issue for a number of reasons which we've outlined in the brief. Number one— But if the jury believed Mr. White's testimony, then don't you have an uphill battle on that basis? Once the jury made that determination and accepted the testimony— Well, one of the things we certainly argue in our brief, Your Honor, is that the law requires that the testimony be corroborated. And we certainly felt that the evidence that was submitted on that issue did not, in fact, corroborate Mr. White's testimony. In fact, the manual that he relied upon, the validator manual, was excluded. It had the wrong date. It was two or three years later than the embodiment that he was talking about. But you've got the LaserCoin operating instructions. You've got the schematic. You've got an article. You've got a number of things that corroborate his testimony, correct? Your Honor, the only thing that truly could corroborate the testimony would be the schematic. The other two documents were far too vague. So it all really came down to the schematic. And the schematic had all kinds of problems too. It was very clear when Mr. White was cross-examined that there were a number of handwritten notations on that document that were not contemporaneous. The court did allow the document in. But there was so much question shedded on that document. So you're saying no reasonable jury could have possibly concluded invalidity based on that reference? We're saying that, Your Honor. But we're also saying, and the court is familiar with the cases that dictate this axiom, that that was just insufficient corroboration of oral testimony. Why? What element of the claim was not adequately corroborated? Well, I think, Your Honor, bottom line, it was just the document as a whole was really drawn into question during this witness's cross-examination. But that goes to weight, not admissibility. It goes to the weight. And the jury already decided the weight. And we don't second guess that. So is there a particular claim element that you think that Mr. White testified about that the document didn't adequately corroborate his testimonial? Yeah. And I think we outlined that in our brief. But there were several circumstances where he was cross-examined considering the specifics of that document where he really didn't know what the handwritten notations meant. Your Honor, he was not an engineer. He was not the person who drafted that schematic. He really had no personal knowledge of it. But that you didn't object to the, well, you did object, I think, to the admissibility of that document. But that's not on appeal to us. You have not asked us to review the determination of whether that document was admissible. So the foundation or personal knowledge issue is sort of irrelevant. Well, that's correct. I think that the argument's really twofold. And where I began in that we don't think it rises to the level of clear and convincing evidence because of all the problems that this witness had on cross-examination. And number two, that the schematic just isn't sufficient corroboration. That's the two arguments we make. Thank you. You want to try to save your time, will I? A few minutes to your principal case. Good morning. Mike Renaud from Pepper Hamilton for the defendant, MEI. Just, I'm going to respond to some of the issues that were raised in your questioning of Mr. Rounds in a moment. But first, focusing on the 406, there's no invention here. We have testimony from JCM's own witnesses that it's a combination of a barcode reader and a bill validator, both known in the prior art, that it was a customer idea to combine the two. We have ample evidence that LaserCoin by itself, Bittner by itself, or the two in combination, which of course is how the jury considered them, either alone or together wouldn't validate the 406 patent. Mr. Renaud, if we were to conclude, I'm sorry. Go ahead. If we were to conclude that the jury's decision was supported by substantial evidence, would we need to address the claim construction issues that were raised? My response would be no, Your Honor. If you rule the patent's invalid, then addressing the claim construction issues would not be necessary. We of course believe that the patent is not infringed and that the evidence is clear that on summary judgment, the expert for JCM produced only conclusory statements to try to challenge the court's infringement for purposes applying to court's construction. Clearly, the product performs no comparison of the kind required by the claim language. Pointing out the acceptability issue, which Mr. Rounds brought up for a moment, acceptability was never a claim limitation that the court imposed for purposes of its construction, and it wasn't the basis of anyone's opinion. Frankly, acceptability is a... The district court did make this somewhat curious determination that the word connected meant it had to be inside of a housing. It seems, I'll gently say curious in terms of claim construction. Let me explore that for a moment. If you look at the 406 patent as a whole, figure one shows the bill validator. And the bill validator is... It has within it, the follow on figures all show details of that bill validator. When you read the specification, it specifically points out that the comparator means is comprised in part of one of the elements is a barcode, the barcode detectors. The barcode detectors are expressly shown in figure one. So you have elements of the discriminator means literally shown in the figures. The CPU is another disclosed piece of the discriminator. But we don't read limitations of respect into the claims. That's very difficult though, because I'm having the same problem. Why would the connector means, why would it have to be in the same place? I just don't understand that. Well, the whole notion of the invention is an improved bill validator. So the notion is you have an apparatus which has constituent parts to disclose the location of the discriminator means in the patent as being within the bill validator, which I don't believe can be challenged, that creates a problem. If you want to locate a discriminator means both inside and outside of the bill validator, which is what the plaintiff is proposing. Well, why isn't the disclosure simply illustrative of one embodiment or one way to do it? The claim obviously was not limited explicitly to the location. Why is it proper to read that arguably exemplary location into the claim? To answer your question, Your Honor, I would say that the distributator means, which is what they're suggesting, if you distribute the functionality, including some of it outside of the bill validator, is so different from the disclosure as to what they're teaching that it wouldn't put people on proper notice as to the scope of the claims. So putting a processor outside of the actual apparatus that you're directing your claims to, seems to me to be so different from an infringement analysis perspective that one looking at the scope of the claims could not be reasonably unnoticed. I will say, Your Honor, that if there was no mention of discriminator means components being resident inside the bill validator, which there are, then you'd have a different analysis. But here they haven't talked about a system with components sprawled across the internet or across a building, they're talking about a device, a single device in which components are expressly disclosed as being within that device. So you believe the disclosure is not exemplary, it's definitive, it defines the invention? Yes, I believe that the invention is limited by the scope of the disclosure, which in fact defines the bill validator in a specific and express manner, which frankly is consistent, I think, throughout the entire specification. Looking at figure three, the CPU is resident smack in the middle and that's the brains of the discriminator means, if you will, and there can be no reasonable argument that as disclosed that's sitting inside the bill validator. I do concede that it doesn't expressly say you can't locate parts of the discriminator means in some other machine, some other building, but that seems to me a completely separate disclosure that's not here. But it would not be outside of the disclosure to provide for it to be separate. There's no limiting requirements in the disclosure itself, mandating it to be together. The disclosure mandates that the discriminator means have certain components which it locates within the bill validator. Yeah, it doesn't expressly say that it can't be outside of the machine, correct, Your Honor? But addressing a couple of issues presented briefly by Mr. Rounds, LaserCoin and Bittner were the subject matter of exhaustive testimony in both by Grossman, the expert for MEI, and by JCM's expert, Mr. Prevelt, and I'm sorry, Mr. Stein, and in that testimony there is an element by element analysis of both Bittner and LaserCoin. There are pages of testimony in regard to each and every element. Mr. Rounds tellingly could not express to you a single element that was missing from that analysis, nor could he challenge when asked specifically, please provide what elements were not corroborated and all you heard were ambiguous statements as to what they were. The reason is it was one of the most exhaustive element by element analysis that you'll probably ever see in a patent trial. So I would say to you that we're not limited to LaserCoin by itself, but ultimately LaserCoin by itself would suffice as would Bittner. Just to point out one important issue here though, the reversal of the claim construction sought by JCM would render this case, would render the patent invalid for different reasons. There were four prototypes which were clearly on sale, the Sigma prototypes. These are JCM's own products. They were tested before they left Japan to confirm that they actually fulfilled the function of the invention. And there's testimony from JCM's own witness testifying that the machine was tested, coupons were used. So before it even arrives in the United States in October of 92, to have the invention is final. But that's something we'd have to remand to the lower court. I mean we can't decide in the first instance whether their on sale activity amounted to an anticipation. I think, Your Honor, actually that the lower court ruled there was a sale or at a minimum an offer for sale. And if you look at the Sigma products as being the basis for a conception or reduction of practice argument that would move behind Bittner as advanced by JCM, I think you're compelled to say there's an admission all the elements are present by JCM in advancing its own conception argument. And all you need to do is look and say was there a determination that there was a sale or an offer for sale below. And I think the answer to both is yes. It's contested by JCM that the court ruled there was a sale. It's uncontested by JCM that the court ruled there was an offer for sale. Can I turn you to your marking? I don't want to move him away if someone else has another question. But your marking argument? Yes. Okay. So as I understand it, there were three products that were sold during the relevant time period. And as I understand the facts, they sold two products and everyone agrees there isn't a dispute that those products were marked between about 2002 and April 2005, is that correct? There's no dispute that the UBA was not marked between April of 05 and December of 05, correct? No, that's not what I asked. I'm sorry. I asked if there is, I said I understand there could be no dispute that between 2002 and April of 2005 that everything that was sold was marked. No, there is dramatic disagreement as to that. Oh, that's right. You disagree over that one of the two products. Actually, both. I believe when the court took the 50A motion sui sponte and granted it in favor of JCM, they made an error of law in that I think there's evidence that the jury could have drawn from the limited evidence presented by JCM that none of them were marked. But taking the simpler route, there is no evidence the UBA was marked and that's conceded by JCM. There, the DBV, there is a single document in which the intention to mark was manifest and it was put into evidence. There's not, despite 40,000 units being sold, there's not a single marked product in evidence. I would say to you that if that had gone to the jury, that evidence, the jury could have concluded no marking in favor of the substantial evidence that there was no marking in the DBV. There was confusion in the record in that Mr. Rounds, when asked if the DBV had been on sale for the relevant period, he said no. There was evidence that was submitted by the plaintiff and admitted that shows 40,000 DBVs were sold and there's not a single piece of evidence that they were actually marked other than a document saying they intend to mark. But there's no evidence that they did. I thought that was limited to the UBA. No, the UBA is a simple cut and dry issue where there's an admission that there was no marking. There was no markings on that. But that only represented 4% of the total mark. Yeah, but I think more importantly, Your Honor, the UBA was a replacement for the WBA and the DBV. There was an acknowledgment by JCM they had an obligation to mark that product. In response to that, if they wanted to collect damages, they knew and practiced the patent. And faced with that, they put 30,000 of their cutting edge product onto the market over the course of several months and took not a single step to mark it. I would say to you, that alone is repugnant to the statute. And if no effort could be made and no explanation was proffered, by the way, to witness as to why that occurred on the stand, if that would be, if that would stand as being sufficient for purposes of continuous, substantial, and consistent marking, I would say to you that we've rendered the patent statute for marking purposes on 287 meaningless. But counsel, they continued to sell, even though you suggest that they meant for the UBA to be a replacement for the WBA, the records, which are hard to read, but with my magnifying glass, I deciphered on 13, 544 to 545, and in that general vicinity, demonstrate that they did, in fact, continue to sell the WBA product throughout the April through December time period of 2005. So it wasn't the case that there was this nine month window where all that was sold was an unmarked product. In fact, both the, if you believe the WBA was marked, and I understand you dispute that, but for my purposes, let's assume that it was marked. If you believe that was marked, then you have a de minimis amount of product, the UBA, based on volume, that was not marked. I agree, all UBAs were not marked. But it's a de minimis amount of things that they sold that fell within the scope of the claims that weren't marked during that period. Well, I would argue to you that one, that since they failed to mark an entire product range, that that's substantial, and there are 30,000 of them. But let me hit the DBV for a second. Suppose there were only 10 of them. So the fact that it's a product range, what difference would that make if there are, say there are 10? I think if there's an incidental batch, we look at C, the SEB case talks about a batch. In that case, by the way, I went to the jury as opposed to this one. But there's a batch, and they accidentally don't mark a batch. That's not a problem. But to have a systemic approach to the marketplace where you don't mark your product is an issue. But let me go back to de minimis. The DBV, Your Honor, with all due respect, there is not a single piece of evidence. That's 40,000 units. It would bring the total to 10,000. I understood, but I said you had to accept my hypothetical, my position being that the WBA was marked. I'm not talking about the WBA, I'm talking about the DBV. There's three products. The confusion is- Assume that everything was marked but UVA. Okay. UVA is the only thing not marked. I mean, the focus of the marking statute is, is the public put on notice by the patentee's actions of the scope of the claims? So one product, it seems to me a distinction can't be drawn along product nomenclature. That it has to be whether or not there's substantial and continuous marking of everything within the scope of the claim. Yeah, what you're saying, Your Honor, is if we concede, which we don't, that the W, it should have gone to the jury as to whether the WBA was marked because there's only one actual evidence of marking. But if we concede it was actually marked, I would say to you that even the 02-05 period of marking for the WBA does not solve the problem, which is you have a 30,000 unit, every single UBA sold, knowing that they were taking at risk the failure to mark. And the public is now being put on notice- That's 30,000 out of a substantially larger number. You can't just look at that number by itself. But, Your Honor, the public is now getting copies of a UBA, 30,000 of them. They could have dozens in their lab. Yeah, but if 30,000 Diet Coke cans accidentally didn't have a marking on them, I mean, what is that? One one millionth of the subset of all Diet Coke cans? I think the public's still on notice. I would say- I think the 30,000 number is big in a vacuum, but when you look at the numbers here, it doesn't seem that way. I would say there's one of two circumstances. If it's new Coke and it's a new product, they need to mark because they're entering the marketplace and putting the public on notice that there isn't an invention inside of the new Coke. If it's the old Coke, or you consider new Coke to be an extension of the old Coke, I would argue to you that the marking hasn't been substantial and the knowing omission of an entire product line, even if it's an extension, they're patented articles that are all bill validators. I'd say the omission is flagrant. And if you rule that there can be no effort made in regard to a new product, and- Well, you'd say it's- What if the product itself, though, is intended to be very limited? That we'll try it for two months and then we'll withdraw it. I think that's a different- And they have no markings on those products for those two months. I think that's more analogous, Your Honor, to a batch. While I would say to you that if they actively are aware of the marking obligation and choose not to do it, which is our circumstance here, I still think you could have a small number where the flagrancy of it needs to be addressed. But I would suggest to you that a small batch of trial products that are later cured by continuous marking would be okay. But you say it's flagrant, and then you say they chose not to do it. And I don't see that the record supports either that it was flagrant or that it was, shall we say, deliberate. As I understand it, there were labels that were created, and then the witness said, I can't explain why they weren't on that model. Let me walk through the evidence as I understand it, Your Honor. Unlike the WBA, where there is a document which says we intend to mark, and then a drawing which says here's what the label looks like, and then an engineering change order saying go mark it. None of those documents were produced or as far as we know exist. They weren't in evidence. There wasn't a single label in evidence for the UBA. There was no testimony. The exact testimony was something akin to this. I don't know what happened to the process. So here we have a company that wants to avail itself of the marking statute for purposes of getting pre-suit damages who can't show a single mark UBA and admits they don't know why. Can't show a single mark W, I'm sorry, can't show a single mark DBV, and in fact, the judge didn't even get to consider that. And then finally, the WBA, all we have is a single unit marked out of hundreds of thousands. It's staggering to me that we can base this on a single unit. Does it matter the fact that they did mark the WBA units? It's not like they were trying to hide the ball or not notify the public at all. Does it matter that they, at least by that act, recognized that the marking requirement did exist? And at least with respect to the WBA units, took steps to avail themselves of the constructive notice. Certainly, your honor, the evidence that the jury did not get to hear that they should have. 50A has a standard that says no reasonable jury could come to a different conclusion. That's not met here. Certainly, a jury looking at the WBA evidence, there's actually evidence of marking a single unit and some internal plans and procedures. That is lacking as to the DBV with the exception of a single document saying they should mark. There was no engineering change order telling them to mark. There was no mark committing, commence marking February 2000, there's nothing like that for the DBV. I would concede that a jury could look at the WBA evidence and at least consider consistent with SEB that there may have been marking. Although I think there's a strong argument that there isn't with a single unit when they could have scoured the earth for them. But the DBV, there's not one single marked item presented as evidence. That to me screams, now the big thing you need to keep in mind is 20% of the product in 2005, the last year before the filing of this case, were not marked. The evidence supports a conclusion of no marking of 20%. What if the product was only 4%? Would that be included in your de minimis calculation? I think past cases have found in circumstances where they can't show they actually took steps affirmatively to mark a particular product, in this instance the UBA, I still think it would be repugnant to the statute. But if it was, let's take the UBA out of the equation, if it was the WBA by itself, and all they did was fail to mark 4% of the units, that would be a different analysis, Your Honor, I concede that. But of course, we have one out of hundreds of thousands of WBAs that actually is shown as marked. But I would point the court to page 91 of our red book brief, which actually spells out in detail the fact that the DBV was on sale for the relevant time period, Your Honor, to your point about, geez, there was continuous marking of the relevant product, that's the WBA, it's continuous, it's substantial. The problem is, is that's 02 to 05, the exact same period of time where the DBV's not being marked. And I say to you, the jury should have got this question. I don't understand the procedure. Can you fill me in exactly on what happened procedurally that prevented this from going? Yes, Your Honor. So what happened- The jury rendered two different verdicts on damage. Yeah, yeah, but they did not look at the issue of whether marking was sufficient. What happened was, we, MEI, proposed that a 50A motion should be granted in our favor. The court- Of no marking. Of no marking. The court said it was going to consider the issue. There was, I think, a day gap. And then the court came back and said, I think there's enough here to grant a 50A. It doesn't say 50A, but to grant a motion to say that the marking issue is concluded. And his conclusion, however, was that there was evidence of marking. The problem with 50A, as you know, the Ninth Circuit says that no reasonable juror could reach a different conclusion. I say to you that if a juror had the DBV evidence in front of them- I'm confused. You're saying the judge in this case that ruled this on pre-verdict J-Law. Correct. And said no marking, no reasonable juror can conclude that these products weren't adequately marked. Correct. Is that what you're saying? Yes. I didn't appreciate the process. And so, you're saying he never gave to the jury the issue of whether marking, and you weren't allowed to present evidence, or were- Correct. The jury never heard evidence of, the jury did not consider evidence as to marking. There was no- Wait, did he hear the evidence? Were you presenting it? The jury was presented evidence, but there was no instruction given to it to consider the issue. The judge took it away. Did you appeal the lack of instruction? Well, once the judge denied our 50A motion- Well, he denied your 50A motion. Did they have a contrary 50A motion? I just don't appreciate the procedure. So what the judge did is, as far as I can read the record, although Mr. Rounds may say they moved my reading of the record, is the judge, in response to our request to grant a 50A in our favor, comes back and says, I don't think this issue needs to go to the jury. I believe that the evidence is that there is no marking, and he doesn't even say- There is no marking, or there is no marking issue? There's no marking issue, sorry, slip of the tongue. But what he says is, based upon the WBA and the UBA, I find marking was substantial and continuous from 02 to 05. And in that order, he actually states that he considered the actual marking of a product of a single UBA that was in possession of MEI as one of the reasons he granted his decision. He said we were on actual notice. So he did send it to the jury, then? He didn't. So he gives his reason on the record as to why he's not going to grant 50A in our favor. He's going to grant it in favor of JCM. The problem with his decision is, independent of completely leaving the DBV out of his analysis, clearly was the case that reasonable inferences could be drawn from the evidence. In fact, I think the reasonable inferences to be drawn by the evidence is that 20%, at least 20% of the products were not marked. The jury never got to consider that evidence. And as a result, it's clear error for the judge to have granted a 50A motion. If you look at the SEB, which is one of the only cases where this type of fact pattern has even been considered by this court. I thought maybe this evidence went to the jury because they asked him, he asked specifically for pre-filing damages. And the jury could have concluded zero because of a failure to mark. No, he did not put, the jury was not given the issue as to whether marking was sufficient. He took it away from the jury. The jury instructions only go to which, they came down with two different figures. And one figure represents a recognition of no pre-suit damages. And the other recognizes damages going back to O2. The judge said, look, in the event that this thing is going to go up on appeal effectively, I want two numbers so we know which way to go. But the judge never put to the jury, it's the vice in the decision. The judge never put this to the jury and he should have. The second number included all of the markings. The second number included damages back to the 2002. Which per force would have been all of the markings at that point. The judge essentially said, marking is substantial and continuous notwithstanding the fact that DBV has no evidence of marking and the UBA. And it must be clear, the judge didn't consider the DBV in part based upon Mr. Round's representation, that it wasn't on sale for the relevant period of time. The whole thing has layers of error. But the most important thing is this, a reasonable juror certainly could have found that the UBA by itself was not being marked, wasn't good enough. Could have found the DBV was not marked. Again, not a single DBV unit, 40,000 units. And it's a question of fact, right? It's certainly a question of fact, Your Honor. You can rule in favor of MEI if you believe that the percentage of product not marked as represented by strike them. You can rule in MEI's favor if you agree that not marking 30,000 units of a single product is sufficient. Well, so is your argument that 20% of the products sold in the last year are admittedly not marked. But if you were to accept our arguments that WBA was not properly marked, it's actually much greater than 20%. No, no. No, the argument is this. If you credit them for marking every single WBA, and this should have gone to the jury. If you credit them with that, as Your Honor posited in your earlier hypothetical, you are still left with 20% of the products unmarked. I'm sorry. So the difference in the math, of course, is the DBV. That's 40- The DBV, that's what I messed up. So, but I don't- 40,000 units of DBVs were sold, Your Honor, during 2002. 20% unmarked represents only the UBAs, is that what you're telling me? No, no. So one more time. I know I'm confusing it. What comprises the 20%? The community of bill validators has three, WBA, DBV, and UBA. If you take every one of the bill validators, all three families, 20% of the units were unmarked. By whose admission? Yeah, that's- The evidence that I offered in support of that are the UBA, the UBA is 30,000 of those units. And the- What percentage is that? The UBA in 2005 sold 31,000 units out of a total of 164. Yeah. So by- 19%. Yeah. And then the DBVs totaled by 2005, Your Honor, was down to 2,900. But the number of unmarked units, as you see on page 91 of our brief, is 20%. And you're including every single product. DBV, WBA, and UBA. The bigger vice, of course, is if you go back to the entire time period, 2002 through 2005, each and every year, the DBV, no evidence in support of marking other than a single document saying they want to, each and every year, thousands of units unmarked, contemporaneous with the marking of the WBA. And what really stands- And those are the fact issues that you think should have gone to the jury. Of course, Your Honor. So you don't think there's a fact issue over the 20% number in the last year, meaning 2005? Mr. Rounds is going to tell you that the DBV, well, I don't know what he's going to tell you, but he's going to tell you the DBV wasn't considered by the judge. So all I say to you is the judge's error was in part not considering the- The DBV, by your calculation, was only 1% of the unmarked product. You said that 19% of the unmarked product are attributable to the UBA, 30,000 of 31,000 out of 164,000, which you said represented 19%. Yeah, I think that math is correct, Your Honor. I'm looking at the table on 91. Roughly 3,000 units of DBVs were not, we believe the evidence supports, no marking in 05. 31,000 UBAs, which totals 20%, but I do believe the 10% number, which is the number across 02 to 05, even if you credit the WBA, you take that away from the jury and don't let them consider it, you still have a 10% big number of unmarked product during the relevant time frame. That is not systematic. What are those, those UBVs? Again, the products that we maintain, there is no evidence of marking, of actual marking, is DBV and UBA. So there is not a single marked item in evidence for DBV or UBA. What is in evidence is that there were 40,000 DBVs sold. So you have this, no evidence of actual marking, a single acknowledgement that they should mark, and then not a single product. Now what's more telling is this, they didn't put a witness up who said, yeah, yeah, I saw hundreds of DBV marked. I'm the guy in charge of marking them. I was on the floor. A customer comes in and says, mine was marked. Nothing, nothing. I think we got your argument. One last question. So as I understand it, your argument is that the judge on his own initiative granted a motion for a summary judgment in favor of the other side that there was no failure to comply with the marking requirement. Correct, effectively, yes, your honor. And did you preserve your objection to that ruling? We, in our subsequent, in our J-Mall papers, we stated in the papers that we believe the judge got wrong, the constructive notice issue, and preserved it for appeal. Against all of the markings? Yes. Okay. All right. Thank you. Let's hear from Mr. Rounds. Let's add ten minutes to his time. Thank you, your honor. In case you need to lead us through this numbering game. Well, I think it posits some interesting issues. However, as the court knows from our papers, we don't think this issue's been preserved. The only thing that MEI did with respect to this marking issue is move for a new trial. More importantly, the only thing they referenced in the motion for a new trial was their summary judgment motion. All of the arguments and evidence that they're making on this appeal were not presented to the court in the motion for new trial. Did they file a 50B motion? They did, your honor, but not on this issue. This issue was brought solely as a motion for new trial. So, I think more important than that was just the simple, skeletal reference that they made to the marking issue. But at page 11662 of the record, the judge asked them about JMAL motions and they said we expressly renew all of our JMAL motions. And he accepted that oral suggestion by them as adequately preserving all of their prior JMAL motions. So why isn't that enough to preserve it? Well, that's at the close of evidence, but 50B requires a motion. And there was no motion made. There was no JMAL motion made. That's the catch in what they're saying, is that that happens all the time. After the close of a plaintiff's case, you move for JMAL, you renew it at the end of trial, but the rule requires 50B, file a motion within ten days. They did file that motion. They filed it purely as a new trial motion. I think most importantly- You can orally raise a motion and a judge can deem that acceptable. You don't have to file paper on 50B motions. So why isn't their oral renewal adequate to preserve the issue? Your Honor, I believe that rule 50B requires that you file a written motion. I don't think- If we don't find a written motion requirement for the renewal of a 50B motion, then do you agree that they have preserved it in light of the statement on page 11, 662 of the record? Yeah, I think that's right. I think that's right. I do think that the rule is requiring something different than that, but I think the court's right. If in fact you accept an oral motion, a 50B motion, I don't think that's the motion they're making. But if you accept that, then the court's right. Can you do it on a 50A motion, orally? Yeah, 50A motions are made orally all the time, as the court knows. That's typically how they're made at the close of the plaintiff's case. So why can't a 50B motion made the same way? That's a fair question. My view of it in reading Rule 50B is that it contemplates a written motion. And I think most importantly, Your Honor, the reason it contemplates a written motion is because they want the court to have the ability to look at all of the record, the transcript, what did the witnesses say? What are you arguing? That is typically, I'm sure, the record that this court sees on a JMAL motion. And that's not what happened here at all. Well, normally a 50B motion is coupled with a motion for a new trial. And there was a motion for a new trial here. If in fact, as Judge Moore indicates, if there was an oral requirement that was met, then we do have a 50B motion follow-up to the 50A. But I will point out one thing to the court. And it really points to why I think the position of JCM is correct. And that is they did file a 50B motion. They did file that motion. And they gave the court the opportunity to consider all their arguments. A voluminous motion on everything. All of the issues that were presented in that same motion. They have a tiny sliver referring to Rule 59, motion for new trial, and referring to the summary judgment motion on marking. And I just don't think that can be determined to be an adequate raising of the issue for appeal. The Fresnias case is very clear about that. You cannot make a skeleton reference in a post-trial motion and preserve it for the appeal. That's what they did. Did you move for summary judgment or JMAL on the marking ground, that there was adequate marking? Here's what I think the record will bear on that issue, Your Honor. They raised it to the court. But they raised it purely on this issue that the court has been discussing with my colleague, that the UBA wasn't marked. That was the issue that they asked the court to rule as a matter of law. And they did not argue that there had not been substantial compliance with the marking statute in the event, put another way, that we hadn't been marking the WBA or the DBB or any of these products. Their argument was very specific. It was just this UBA issue that the court has been asking the questions about. I said at the time when that was raised to the court, yeah, I think the court can rule on that issue as a matter of law. And that's ultimately what happened. When he ruled as a matter of law, he solely ruled on the issue that the court's been discussing with my colleague. And that is, okay, where are we if you didn't mark the UBA in light of all this other marking that went on? That's the issue the judge decided. But I thought they did raise, and correct me if I'm wrong, I thought they did raise the issue of whether the other products had been adequately established by the evidence you presented to have been marked. On summary judgment they did, Your Honor. Looking at the transcript yesterday in preparation for this argument, when I looked it over, Mr. Bannon, who made the motion, simply was focusing on this UBA issue not being marked. I thought that in the papers that they had argued that there was inadequate evidence presented of the other products, though. And isn't that- They did, it depends what paper he's referring to, but certainly they have on appeal, but not below. No, in fact, even if you look at the summary judgment motion, they never raised the issue of this DBV. That never came up below. And just to touch upon the comment that was made by MEI's counsel, the testimony of Mr. Izawa was very clear that the DBV was marked. We certainly have more than just the document that he referenced. So that's procedural posture, Your Honor. I certainly don't recall and don't believe the record will show that they made it on an issue that we did not mark the DBVs or the WBAs. So you're saying that the only issue the district court had in front of it, which it was deciding as a matter of law, was whether failure to mark the UBA in light of all of the other products being marked amounted to a failure under the markings. That's right, and the transcripts are very clear on that, that that's all he was deciding. Well, the UBA markings were admitted that there were no markings by both parties. That's right. That came out on summary judgment. In fact, at summary judgment, they did raise the issue of whether there had been marking on summary judgment, Your Honor. That did come up at that time. But at trial, certainly the record hopefully will bear me out. But my recollection, and from studying this issue last night, is the only thing that they moved for JMAL on, and we actually agreed to, was this issue of where does the UBA leave us? What kind of evidence was submitted to support the DBV and the WBA evidence for marking? The testimony of Mr. Uzawa, probably six to seven engineering records that showed the label and where it was to be placed on the product, and the product itself, and in addition, the marked product that was in the possession of MEI. Now, the court mentioned earlier, one of the- When did that marking start? When was that policy implemented? 99. So there had been three years of marking. So it covered all of those particular products except for the UBA. Yeah, UBA wasn't introduced until 2005, right? So basically, and counsel's correct, at the time of the trial when this was posited before the judge, I was mistaken. I thought the DBV had been phased out. And in fact, they're correct that some were sold. But the record was in there, that in fact, that they've been marked. When was the UBA taken off the market? The UBA? Never, it was put into the market in 2005. And it continues to be on the market today. That's correct. Is it marked now? I assume so. You assume so, right? Yes, and so let's get to the crux of the court's questions on this issue. And I think there's two cases out of the Federal Circuit that hit on this. One is the Nike case, and the other is American Medical. And we believe that if you do consider this issue and you look at the collective whole, that we've got 96% of the products marked over a period of three years. Probably longer, but if we're looking at the relevant time frame for when infringement commenced, there was substantial and continuous marking of the products as a collective whole. Now, Nike says that it has to be substantially all, and I think we've met that test as well. Again, looking at what this company did- Is there any intent standard, or should that be relevant to an analysis of marking? I don't think so, not the way I read the statute, Your Honor. How do we determine what is substantial and continuous? Where do you draw the line? On what basis does a court conclude that there's been substantial compliance? Is it a percentage? I think that's certainly one factor. I think you could have a case where products are very, very expensive. And maybe you've got 150 products. But we have a case where there was a lot of products, many, many, many products. The vast majority- Should a court look to see whether there was a policy in place and that whatever products were not marked were excusable for some reason? In other words, in determining whether there was substantial and continuous use, does a court look to see whether there was some failure to mark? I think it could be relevant evidence, but to be honest, Your Honor, I don't read the statute that way. I think the statute is as plain and simple. And the two cases that are most prominent in this area from the federal circuit have essentially said it's substantially all and that it be substantially continuous. And we think we satisfy both standards. But you're asking us to determine what the minimum amount would be for not being marked, right? What would be the minimum, 4%, 10%? And I think that's going to differ on the facts of each case. But I do think in this case, when you look at the number of products that were placed in commerce, and you look at the percentages that we satisfied, that you can say that the marking statute was satisfied as a matter of law. I don't think you need to decide in this issue whether or not 88% is enough. because I do think you need to focus on what the products are, how many there were, and what the aggregate whole was of the number that was marked versus the ones that were unmarked. That seems to be the analysis that is being undertaken by the federal circuit when it gets into these issues. Does it make a difference if a party is acting deliberately or not? In other words, let's say you have a company that inadvertently fails to mark 2% of its products compared to a company that deliberately chooses not to mark 2% of its products for one reason or another. I don't read the statute that way. I just think that the statute says- You just look at 2% and decide is that or is that not substantial? That's how I see it. I'm not here to say that it's irrelevant evidence. But I do think that at least the way I've read the cases out of this court, that they're simply looking at the statute and they said, okay, it means substantially all. Is your view based on a belief that the policy behind the marking statute is to make sure the public is on notice, so it's irrelevant what the patentee's intent is? Yeah, I think that's right. And again, just focusing on the cases that we've looked at and read, that seems to be the analysis that the court has undertaken. What if there were no marking during the last year? What if it was systematic and continuous and everyone agreed 100% of the products were marked for the three years of 2002 to 2005, but nothing at all was marked during that nine month period? I think my response would be how many products were unmarked in that period, okay? Would you then have continuous, I guess? I mean, systematic and continuous is not a percentage over a long period of time, right? It has to be continuous. If you have lapses in continuity, how can you have marking? Right, I think under the hypothetical the court has posed that if there was a year without any marking, that the right result would be that there'd be no marking under the statute. However, that would raise a different question, now wouldn't it? It would raise the question of whether or not the damages period would be allowed for the period of time in which it was systematic and continuous. But I don't think that's before this court either, in my view. Well, hypothetically, if I had a product and I had a policy to mark every other one, that would still be continuous? I intend to mark? No. But only 50% of my products hit the market with the marking. Will that comply with the statute? They would flunk the other test of Nike, and that has to be substantially off. So you would say that 50% is not the minimum? I would say 50% would not satisfy the intent of the statute, that's for sure. So how much higher would we need to bring it? Does that vary? I think it needs to be looked at on the facts of each case. And the reason I say that is because I think each product is different that's marked. And again, if you have a situation where there's only 150 products as opposed to the millions we have at issue here, I just think it's a different fact pattern. And you just have to look at the facts as a whole. Do you think there's any difference in applying the test as de minimis compared with substantial and continuous? Or that you consider the two as the mirror reflections of each other? I think they're consistent, yes. I think it'd be more consistent with substantially all, which is the words that Judge Newman used in Nike. So I think substantially all. You can make the argument, I think, that if more than 50% were marked, that's substantial. And if more than 50% were marked continuously over a period of time, you could make the argument that's substantial and continuous. But if the units that were not marked demanded to 40%, that's hardly de minimis. My point would be, I think that 50% would not be substantially all. Under any reasonable interpretation- Your assessment of the test is not simply substantial and continuous, but substantially all- That's right. Continuous. Yes. But it'd still be a jury determination to make that. I think ultimately, yes. Well, your honor, and this is directed to Judge Moore. I did just want to follow up on one quick point. So the court understood my argument as to the 406. The court is correct that the court made a finding on summary judgment that the discriminator meets had to be within the bill validator head. There's no question. But also, with that finding, the court indicated and made a finding as to what's going on in the head. Mr. Rounds, that's part of your original argument. That's correct. That's supposed to be replying to a cross appeal. Whenever a judge tells me that she didn't understand what I said, I want to respond. We understand that. Thank you very much. Okay. I just want to hit- We'll put three minutes back on the clock for you and I'll let you do it. Thank you, your honor. I want to clear up the procedural history. Quickly cover a public policy issue that we haven't addressed and then I'll be finished. So at first, just to clarify the record, at the close of plaintiff's evidence, there was a conversation between the parties in the court as about jury instructions. That's the context in which the judge made his 50A ruling. That ruling included exhaustive conversation about the WBA and the UBA, but I refer you generally to JA11497 for that discussion. But more importantly, 50B simply does not apply. In 2006, for the amendments of the rules- Counsel, I've got to ask you a question. Because you suggested that the district court basically shut down all of your ability to argue marking and put evidence before the jury and have a decision made by the jury, right? You say that in earlier motion stamp practices, he said, nope, there's adequate marking and that you can't, basically you would not be able to put on evidence related to whether the WBA and DBA were marked. No, no, I don't think that's the case, your honor. I meant to say the judge wouldn't let the jury consider that evidence. The evidence was put forward. The judge just didn't give the jury a chance to consider it. I don't understand. I'm reading the record here and there's lots of evidence and the judge says this is about marking. Ladies and gentlemen, there may be a challenge to patent infringement based on the timeliness of the marking of a product. And he goes on and on to explain it all to the jury why you're putting on all this evidence and they're putting on evidence. So all of the evidence was before the jury. He didn't shut down your ability to put on evidence. Yeah, yeah, I'm saying if the jury got to deliberate on the evidence that was before them. I'm not saying any more evidence needs to be- But you didn't object to the lack of a special verdict form or the lack of a jury instruction on these points? You didn't object to any of them? Well, actually, it was in the context of a discussion over the jury instruction at the close of the plaintiff's evidence where the judge said- Show me your objection preserving the issue on appeal that the jury wasn't adequately allowed to consider this evidence and render a verdict on it. Yeah, it was in the context of the exchange on the record in which we- Show me what page it's on. Your honor, I don't have a page site for you, but I will see if I can find one. But my understanding is if you're looking for an express statement, we object. I'm not- That's kind of what the rules look for, right? We object. Since the exchange was literally between counsel as to the merits of the exchange, we expressly stated on the record that we didn't agree with the court's decision. But I don't know if there's a word where we say we object, and then we followed it up, right? So in the context of this case, you have 50A motion is decided by the judge in the context of a discussion about jury instructions. Since the court has already granted a judgment- But you didn't present a jury instruction on marking. The judge wouldn't allow it. You didn't object to the jury instructions when they were issued, the failure to include one on marking, correct? I want to make sure I understand all the things that didn't happen so I can only look for the thing you said did. Yeah, I think procedurally what happened was the judge takes up the 50A, grants it, thereby taking it out of the context of 50B, because there's already been a decision as a matter of law. And then we proceed to file a JMAL paper saying- But if I construe his decision on 50A to be limited to whether, if the facts demonstrate 20% are during a nine month window are not marked, that that is inadequate as a matter of law, and if I construe his opinion as limited to that, then didn't you have an obligation to continue to either A, point out to him and B, to point to present evidence to the jury that these, no, that's not the only marking issue before the court. There are these other factual issues which do need to be resolved. Well, I think, Your Honor, in the context of the case, we renewed our prior motion, including our summary judgment motion. We said to the court in our post-trial papers that the constructive notice issue was decided wrongly. And during the actual exchange on the merits, Mr. Bannon got up and said, look, Your Honor, this should go our way. Is there an express statement of objection, Your Honor? I don't recall seeing one during that exchange. Wasn't there some confusion as to whether there were any sales at all of the DBV unit? There was. At the time, Mr. Rounds represented, and I believe he did it in good faith, that there were no sales. And as a result, when the judge states on the record his reasons for granting, he doesn't include the DBV. Now, when did it come to light that there was this issue that was not being considered with respect to these DBV units? When did that come to light? During the exchange when the judge granted the motion, counsel for MEI said they were not aware of the details associated with Mr. Rounds' representation of no sales. And it was only after when we moved the motion saying that the constructive notice wasn't provided that counsel was in possession of the information that there were actually DBVs that were on sale. As Judge Moore has pointed out, it's within the appendix, there are spreadsheets that are difficult to read, but they do include DBV sales. So you're saying on the motion for reconsideration, this issue was brought to the court's attention? No, Your Honor, Mr. Rounds is right that the placeholder for purposes of the marking issue that was in the JMAL papers was a paragraph saying that neither plaintiff is entitled to pre-suit damages because neither complied with the constructive notice provisions and because both unreasonably delayed in filing a suit, etc. So that is the- Yeah, but the problem is that the issue here all centers around the facts relating to the DBV units. And you need to establish some basis on which you can now assert that that was an issue that should have been resolved, that you were entitled to present to the jury. Well, the jury was presented with plaintiff's evidence that there were sales of the DBV. And so the- No, but that was all in the context of deciding what the numbers should be, depending on whether there was or was not compliance with marking. The issue of compliance, it seemed to me, was not presented to the jury. And you're arguing it should have been, and my question is on what basis? Well, it should have been presented to the jury on the basis that there was evidence that was presented by both parties from which the jury could infer that there was no marking, and that would be as to the WBA, the DBV, and the UBA. And- Was that table on your red brief 91 ever presented in the lower court? No, Your Honor. That's basically assembled for the appeal. All, as you can see from the table, Your Honor, there are references to each part of the appendix from which that data is derived. But you are correct, Your Honor, that table was not presented to the jury. Well, that's what I understand, that you can derive this from all of the evidence in the appendices, but this was never summarized and presented at the trial in a simple form. Correct. That would show on the page 91. That's correct. This was not assembled for- Now, one of your arguments is this mistake regarding DBV. Counsel represented to the court they weren't still being sold, so he disregarded them for a marking analysis, right? The judge did, yes. Yes. At least he appears to have. But your table on 91 that Judge Gallarza was just pointing out shows that the DBV sales represent less than 1% of the sales. And so I guess my question to you is isn't his error merely harmless in error? If we agree that the marked product represents a large enough percentage to constitute systematic and continuous and that even if it were 1% less, if we should agree with you that the DBV units weren't considered unmarked and they should have been, it's a 1% swing. Is this harmless error that he didn't consider them? No, 2005 is 1%, Your Honor. The 5% of the products during the period of time is the DBV. So if you take the DBV is 5%, the UBA is roughly 5%, so your 10% number is an addition of the DBV. There, frankly, are more DBV units that the evidence supports no marking of 40,000 than there are UBAs, which were 30-something. The combined number, Your Honor, is 10%. So the DBV is a larger complement of unmarked products, and I'm saying it's roughly 5%, 5.5%, than the UBA. But if I could, I want to just make sure that the procedural posture of this issue is proper. 50B says if the court does not grant a motion for a judgment as a matter of law under Rule 50A, clearly the judge, in fact, granted a motion as a matter of law, and there would be no requirement to ask the judge to revisit a legal issue that he's already decided. The issue did not go to the jury. 50B simply doesn't apply. But if I might, one final point, Your Honor. One sentence. The American medical case stands for the proposition of the fairness associated with the marking statute. If you place products into commerce and you don't mark them, you're not upholding the policy concern, and at the end of the day, you're putting, in the rule of reason cases, you ask for good faith efforts by the licensee or whomever the company is that they're actually marking. That's a compound sentence. Thank you. But in this instance, you would, if they would. Thank you very much. Thank you, Your Honor.